## No. 2415.—D. W. McCRANIE et als. *v.* M. N. WOOD.

In this cause the evidence shows that defendant made a contract with plaintiffs, all residing within the rebel lines of military occupation during the late war, whereby he was, with his steamboat, to transport their cotton from the different plantations where it was then lying, to such other place as the defendant might deem safe from the casualties of the war, for which he was to have one-fourth of all the cotton saved. Defendant performed his part of the contract by transporting large quantities of cotton to other points then deemed safe. But in the progress of the war the cotton thus removed to its new locality fell directly within the lines of active military operations, and was either stolen or destroyed by fire. The owners now bring suit against Wood, the contractor to remove it, either for the cotton or its value.

Held, that it being shown that Wood had performed his part of the contract as far as it was in his power; that the cotton was destroyed or stolen by an overpowering force in time of war, which he was unable to resist, he was not legally liable for the cotton, nor its value.

APPEAL from the Fourth District Court, parish of Orleans. *Théard,* J. *Edward Phillips,* for plaintiff and appellant. *Clarke & Bayne,* for defendant and appellee.

WYLY, J. The plaintiffs allege that in May, 1862, they shipped on

the steamboat Red Chief, of which the defendant, Wood, was master and owner, one hundred and six bales of cotton, which the said Wood agreed to deliver at the port of New Orleans, "or such other port as the said shippers might think, as soon as the war which was then raging should terminate, until which time he was to take care of and keep said cotton safely, for which service he was to retain one-fourth of said cotton;" that said cotton was taken by said Wood on board of said boat in the Atchafalaya river and carried away by him, and he has failed to return the same at the port of New Orleans, as they have requested him to do, or to account for the same in any way; that he has fraudulently disposed of it for his own benefit and advantage; and that the value of said cotton at the time it should have been delivered was $250 per bale.

. The prayer of the petition is for judgment against the defendant for $19,875 and interest.

The defendant pleads the general denial, admits that he was master of the steamboat Red Chief at the time said cotton was taken on board, but avers that it was exposed to imminent danger of loss and destruction by burning, which was then extensively carried on in that region by parties acting, or pretending to act, under the authority of the so-called Confederate government; that plaintiffs and others desired this respondent to receive their cotton on board said steamer, and to convey it to such place or places of safety as in his judgment might be found, agreeing to give him one-fourth of said cotton that might be saved; that he did, to the knowledge, request and satisfaction of said plaintiffs, carry the same to Cow Island, in Bayou Flagon, a secluded place, and there store the same according to his best ability; that he exercised all the care and diligence of which he was capable in preserving the same; that it was taken by overpowering force, and either run off or destroyed.

The respondent specially denied that he ever used or converted a single pound of said cotton, and he avers that the charge is maliciously made against him by the plaintiffs.

The court rejected the plaintiffs' demand, and they have appealed.

We think the evidence fully sustains the defense.

The plaintiffs were anxious to save their cotton from being burned; they gave it to the defendant to be conveyed to such place of safety as he might find, and there to be kept till the war terminated, and then to be brought to New Orleans, he receiving one-fourth thereof for his services.

Owing to the condition of the country in 1864, we think the defendant could not have prevented the parties who got the cotton from taking it.

The place where it was stored was at the time probably as safe as

any other—at least the defendant thought so. It is proved that he never converted or appropriated the property, and that all the cotton in that region was burned or stolen during the war.

The defendant, who was examined as a witness, states: "I was captain of the Red Chief in May, 1862; was in the Atchafalaya with the Red Chief at the time when Bennet B. Simmes came to me and proposed to give me a load of cotton to take to some secure place wherever I chose, and to keep it until the close of the war, and then (if saved) to be delivered to merchants as per bill of lading. I received from various parties five hundred and ninety-four bales upon the same terms. I was to receive one-fourth of the cotton, if I saved it and succeeded in getting to New Orleans with it, there to be delivered to different consignees. I carried the cotton into Catahoula parish, on an island in Catahoula Lake, named Cow Island, on Bayou Flagon, which empties into the lake. This was as secure a place as I knew of in the State, and the cotton would have been kept safe had it not been stolen.

"I employed a man to look after it as long as the state of the country would permit. His name was Wilson, and he wrote to me occasionally concerning it. I went once to see it with the steamboat, with the intention of removing it, but after getting there and seeing the condition of things, I changed my notion; because Cow Island was a secure place, and the bagging being loose, the cotton might have been destroyed in removal. At the time I took this cotton on board, cotton was being burned in the neighborhood. I had three hundred bales of cotton on Little River about twenty miles below Cow Island. This cotton was my own property, and was burned by order of General Walker of the Confederate forces. I had other lots above, on Little River, all being my individual property; one of these lots was burned and the other two were stolen.

"I carried a great deal of cotton up Little River for other parties, none of which was saved, so far as I know.

"Very little cotton on Little River was burned; most of it was stolen about the time of General Banks's raid.

"The cotton in controversy was stolen about the time of this raid, as no one could get into the country, and if I had had a thousand men they could not have protected this cotton; there was a great deal of burning and stealing at this time. It was unsafe to travel through the country; jayhawkers and thieves abounded. I have never sold nor taken away, nor received a pound of this Cow Island cotton. I exercised all the care in my power for its protection.     *     *     *     *     I was asked to take the cotton on board the Red Chief to save it from destruction. A portion of the load was to have been burned the next day—a portion having been hauled out for that purpose."

Judge Merrick was also examined as a witness. He states: "That

he was on the Atchafalaya at his plantation, in April and May, 1862. Knows that there was great anxiety on the part of the cotton planters relative to the burning of their cotton, as Captain Brown, in that beat, and Captain ————, in the adjoining beat, said they had instructions to burn cotton. Witness conferred with Brown to induce him to defer burning cotton, and planters were very anxious to get their cotton removed by steamboats to some safe place. Witness saw the Red Chief lying in the Atchafalaya; thinks he saw her when she came up from General B. B. Simmes'. Witness sent off some cotton, say twenty-six bales, by the Red Chief the same trip. It was to be taken up Little River by Captain Wood, and he was to take it to some place which he considered safe, and to be kept till the close of the war, when he was to bring it to New Orleans for sale; and he was to have one-fourth for his trouble in taking it to a place of safety and bringing it to New Orleans after the war. I understood he was to take my cotton on the same terms he took the cotton for the other parties.   *   *   *   My understanding, however, was that my cotton was to be taken on the same terms as that engaged by General Simmes for, I think, McRea and others; this I feel quite sure of. My understanding was that Captain Wood was to take the cotton to some place which he thought safe, and take reasonable care of it. I did not suppose him responsible for casualties, and I have made no demand on him for payment. A great deal of cotton was burned in the adjoining beat about this time, or a little later, and some in this beat."

After fully examining the evidence, we have concluded that the facts stated by these two witnesses disclose the true state of the case. The country was in a state of war, and the port of New Orleans was occupied by the national forces at the time the contract was made between the plaintiffs and the defendant in relation to the cotton, which was in rebel lines. The services of the defendant and his boat were employed in the desperate effort to avoid the loss and to save, if possible, the cotton from the casualties of the war—the defendant, by the contract, being made a partner to the extent of one-fourth of what he might save.

From the evidence we are satisfied he acted in good faith, and did for the plaintiffs the best he could under the circumstances, it being no part of his contract to insure against the casualties of the war. As all the cotton in that region of country was destroyed or stolen; as lawlessness and violence prevailed, we believe it was impossible for the defendant to save the cotton in which he was interested as a partner to the extent of one-fourth; and therefore conclude it will be against law and good conscience to condemn him to pay what is demanded by the plaintiffs.

The principles of the law of common carriers is not applicable to a case like this.

Judgment affirmed.